786 So.2d 819 (2001)
Darrell COLEMAN
v.
CHRISTIAN HOME HEALTH CARE.
No. 99-CA-2948.
Court of Appeal of Louisiana, Fourth Circuit.
April 11, 2001.
*820 Kern Anthony Reese, Kern A. Reese & Associates Inc., New Orleans, Counsel for Plaintiff/Appellant.
Frederick H.N. Dwyer, Bailey & Dwyer, Mandeville, James A. Oswald, Shields Mott Lund L.L.P., New Orleans, Counsel for Defendant/Appellee.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY and Judge DENNIS R. BAGNERIS, Sr.
ARMSTRONG, Judge.
This is a personal injury case in which the plaintiff alleges that a home health care service failed to adhere to the proper standard of care and, as a result, he suffered *821 a gangrenous penis. The jury returned a verdict for the defendant and, in particular, determined, in response to a jury interrogatory, that the home health care service did not fall below the applicable standard of care. Based upon a careful review of the record as a whole, we conclude that the jury was clearly wrong/manifestly erroneous and/or that, as a matter of law, the home health care service breached a duty to the plaintiff. Thus, we must reverse the judgment of the trial court. The plaintiff, Darrell Coleman, is a paraplegic. At the relevant time, he lived by himself in his own home. However, he had no means of transporting himself elsewhere and required the assistance of others to go to see a doctor. He required home health care because of very severe ulcers ("bedsores"). He was incontinent and required the use of a Foley catheter which was inserted through the penis into the bladder. His home health care was supplied by the defendant Christian Home Health Care ("CHHC"). Mr. Coleman was cared for by Nurse's Aid Joseph Perkins and Licensed Practical Nurse Larry Hills. They were CHHC employees. On August 31,1990, Mr. Perkins, the nurse's aide, observed blood in Mr. Coleman's urine. Licensed practical nurse Larry Hills was called to see Mr. Coleman, observed that Mr. Coleman's penis and scrotum were swollen and advised Mr. Coleman to go to the hospital. Mr. Coleman's sister was called and Mr. Coleman's nephew came and took Mr. Coleman to the Veteran's Administration Hospital the next day, September 1, 1990.
At the Veterans Administration Hospital on September 1, 1990, Mr. Coleman was given an antibiotic, bactrium, discharged and told to come back in ten days. On September 3, 1990, Mr. Hills made a routine visit to Mr. Coleman and observed that Mr. Coleman had blood in his urine. Mr. Hills testified that the blood in the urine that he observed on September 3, 1990 indicated that there was a problem and that Mr. Coleman was suffering from a trauma somewhere. Mr. Hills testified that he told Mr. Coleman on September 3, 1990 to go to the Veterans Administration Hospital to be evaluated. However, Mr. Hills did not call Mr. Coleman's sister or other family members to inform them that Mr. Coleman needed to go to the hospital and made no other attempt to get Mr. Coleman to the hospital. Mr. Hills did call the CHHC office to report Mr. Coleman's condition to the Director of Nursing, Miss Davis, but she did nothing.
On September 6, 1990, Mr. Hills once more visited Mr. Coleman. On this visit, he observed that the swelling of Mr. Coleman's penis had increased to the point that the penis was twice its normal size. Once again he advised Mr. Coleman to go to the hospital but, once again, Mr. Hills did not call Mr. Coleman's sister or other family members and did nothing to get Mr. Coleman to the hospital. Mr. Hills did call the CHHC office to report Mr. Coleman's condition to the director of Nursing, Miss Davis, but, other than "supposing" at trial that she would have called the hospital, she did not know of anything she did in response to his report.
On September 8, 1990, Mr. Coleman's nephew took him to the Veteran's Administration Hospital. At the hospital, Mr. Coleman was diagnosed as having a "frankly necrotic" (i.e. gangrenous) penis of two days' duration. This meant that there was dead penile tissue. Mr. Coleman was advised that he needed surgery to his penis to remove the dead tissue. He also was advised that it might be necessary to amputate the entire penis. The surgery was performed, and the penis was not amputated, but it was necessary to perform a "debridement", a removal of dead tissue, from almost all of the penis. *822 However, for some time after the surgery, Mr. Coleman believed that his penis had been amputated.
During the surgery, a suprapubic catheter was placed through Mr. Coleman's abdomen directly into his bladder. That catheter was still in place at the time of trial and was expected by Mr. Coleman to be permanent. Later, a second operation was performed to graft skin from Mr. Coleman's leg onto his penis. Mr. Coleman testified that, prior to this injury to his penis, he had sexual function but, after the injury, he did not. He was hospitalized for over two months. There was uncontradicted medical testimony to the effect that necrosis takes 5 or 6 days to develop and that, if Mr. Coleman had been gotten to the hospital at an earlier date, then he would not have suffered the injury of a necrotic penis.
The dispositive issue is whether CHHC should have gotten Mr. Coleman to the hospital at an earlier date. The plaintiff presented the expert testimony of Maria Trattler, R.N., as an expert in nursing. Nurse Trattler is Assistant Professor of Nursing at LSU Medical Center and was established at trial as very well qualified, both by advanced academic training and by long practical experience, as an expert in the standards of care for nursing. She had several criticisms of CHHC's care of Mr. Coleman. First, she opined that, because of Mr. Coleman's paraplegia and the severity of his ulcers (bedsores), a fullytrained Registered Nurse, rather than a Licensed Practical Nurse such as Mr. Hills, should have been assigned to Mr. Coleman. Second, she opined that, when Mr. Hills observed the blood in Mr. Coleman's urine and the swelling of his penis and scrotum, a Registered Nurse should have been sent to assess Mr. Coleman's condition. Third and most importantly, she opined that, on September 3, 5, and 6, Mr. Hills should have done whatever was necessary to get Mr. Coleman to the hospital. She testified that Mr. Hills should have telephoned one of Mr. Coleman's family members to take him to the hospital. In fact, Mr. Hills testified that just a few months before the events in question, in May 1990, he had telephoned Mr. Coleman's sister to tell her that Mr. Coleman needed to go to the hospital, and that there had been no problem with that procedure. There does not appear to be any reason that Mr. Hills could not have repeated that procedure in the September 3-6, 1990 period of the events in question. Nurse Trattler also testified that, in the absence of assistance from Mr. Coleman's family, Mr. Hills (or someone else at CHHC) should have called the Social Worker at the Veterans Administration Hospital who was assigned to Mr. Coleman's case to arrange transportation. As a last resort, Nurse Trattler testified, Mr. Hills or someone else at CHHC should have called an ambulance to take Mr. Coleman to the hospital. Nurse Trattler emphasized that, above all else, Mr. Hills and CHHC had a duty to do more than tell Mr. Coleman that he should go to the hospital and that the duty was to ensure that he did, in fact, get to the hospital.
Nurse Trattler's above discussed expert opinions are unrebutted. CHHC argues that Mr. Hills advised Mr. Coleman to go to the hospital and that Mr. Coleman himself should have called his family members to get him to the hospital. However, on this point, Nurse Trattler testified that a nurse has a duty to act as an "advocate" for the patient and that, when Mr. Hills saw that Mr. Coleman had not acted so as to get to the hospital, then Mr. Hills and CHHC had a duty to act so as to get Mr. Coleman to the hospital. She emphasized that this duty was particularly strong because Mr. Coleman was a paraplegic who *823 lived alone. CHHC points out that one of Mr. Coleman's treating physicians, Dr. Salvatore, said in his deposition that a patient has a responsibility to follow through on a nurse's orders. Aside from the fact that Dr. Salvatore was not qualified as an expert in nursing, his testimony was a generalization. He did not contradict Nurse Trattler's expert testimony that when a patient fails (despite the nurse's advice) to get to the hospital when it is necessary, then the nurse has a duty to see to it that the patient does get to the hospital, especially when the patient is a paraplegic living alone. Moreover, common sense dictates that, as between a layperson in Mr. Coleman's position, and a professional health care provider, it is the professional with the ultimate responsibility.
In sum, based upon Nurse Trattler's uncontradicted expert testimony, we conclude that CHHC did breach its duty to Mr. Coleman, and failed to meet the standard of care for nursing, by failing to see to it that Mr. Coleman got to the hospital in a timely manner.[1]
It is apparent, however, that Mr. Coleman also bears responsibility for his injury. There was testimony, which the jury could reasonably credit, that Mr. Coleman catheterized himself, and did so improperly, so as to initally cause the infection. More importantly, although Mr. Coleman is disabled, he is able to understand nurses' instructions and had a telephone next to his bed that he could use to call relatives for assistance. The fault of Mr. Coleman and CHCC appearing to be about equal, we assessed 50% comparative fault to Mr. Coleman.
The damages suffered by Mr. Coleman are detailed above, in the discussion of his surgeries, hospitalization and their aftermath, and consist of general damages in the form of physical pain and suffering, mental distress and emotional anguish, and disability. These damages are most certainly substantial and we fix the monetary damages at $250,000, to be reduced by 50% due to plaintiff's 50% comparative fault.
For the foregoing reasons, the judgment of the trial court is reversed and we render judgment as aforesaid.
REVERSED AND RENDERED.
*824 MURRAY, J., concurs with reasons.
PLOTKIN, J., dissents with reasons.
BAGNERIS, J., dissents with reasons and concurs with J. PLOTKIN's dissent.
MURRAY, J., Concurring with Reasons.
For the reasons that follow, I concur in the majority's reversal of the trial court's judgment insofar as the finding of liability on the part of Christian Home Health Care, the amount of damages incurred, and the assessment of 50% fault to Mr. Coleman in causing his own injury.
I agree with the majority that Nurse Trattler's expert testimony, which was not contradicted, established that CHHC had a duty, which escalated as Mr. Coleman's condition worsened, to take some further action to ensure that he received the proper medical attention prior to September 8, 1990. All of the medical testimony indicated that because necrosis takes several days to develop, Mr. Coleman's condition would not have been as critical had he been seen by a physician even two days earlier.
Mr. Hills testified, and his notes reflect, that on May 7, 1990, when he was unable to insert Mr. Coleman's catheter due to penile spasms, he told Mr. Coleman to go to the hospital to have it inserted. Two days later, on May 9th, when Mr. Hills realized that Mr. Coleman had not complied, Mr. Hills called Mr. Coleman's sister and informed her that her brother needed to be taken to the hospital. This incident shows that there was an awareness on the part of CHHC that Mr. Coleman, due to his disabilities, did not always follow the advice of his health care providers.
Nevertheless, during the sequence of events which occurred between September 1 and September 8, 1990, the CHHC employees who saw Mr. Coleman almost daily and were clearly concerned about his deteriorating condition, did nothing more than tell him he needed to get to the hospital. The evidence reflects that Mr. Hills, a licensed practical nurse, visited on September 3, 1990, noted that there was pinkish urine and leakage from Mr. Coleman's catheter, and, therefore, told him he needed to return to the hospital. Mr. Perkins, a nursing assistant, saw Mr. Coleman on September 4th, noted that his penis was swollen, and informed Ms. Gardner, the nursing supervisor, of this fact. On September 5th, Mr. Hills visited again and noted that there was discolored, dark urine in the bag and that Mr. Coleman's penis was swollen; Mr. Hills again told Mr. Coleman to get to the hospital, and he also spoke with his supervisor at CHHC to inform her of the problem.
On September 6th, Mr. Hills went to see Mr. Coleman one day earlier than he was scheduled to go because, as he testified, he was worried about Mr. Coleman's condition. On that date, Mr. Hills noted that Mr. Coleman's penis was enlarged to twice its normal size and there was abnormal drainage from the catheter. Mr. Hills reiterated to the patient that he had to see a doctor, asked Mr. Coleman if he wanted him to call his sister, and when Mr. Coleman responded negatively, asked if he wanted an ambulance to take him to the hospital. However, when the patient persisted in refusing his offers to help, Mr. Hills did nothing further other than to call the CHHC Director of Nursing, Ms. Davis, and inform her of the situation. When Mr. Coleman finally got to the hospital on September 8th, he was diagnosed with a frankly necrotic penis of two days duration, with the clear implication, which was confirmed by expert testimony, that if he had received medical attention even two days earlier, he would not have required *825 the drastic surgical procedure that he ultimately underwent.
In view of this evidence and Nurse Trattler's testimony, I find it an inescapable conclusion that CHHC breached its duty to Mr. Coleman by failing to do more to ensure that he got medical attention earlier. Therefore, I concur in the majority's reversal of the trial court with regard to the liability of CHHC.
Additionally, I conclude that the amount of damages assessed by the majority is reasonable and is supported by the evidence; therefore, I concur in the decision with regard to quantum.
I also agree that Mr. Coleman bears equal responsibility with CHHC for contributing to his injury by his own behavior, especially by his failure to do anything to help himself or to accept the help that was offered. Both Mr. Hills and Mr. Perkins testified, and Mr. Hills' written notes reflect, that Mr. Coleman catheterized himself on August 31, 1990, which he clearly knew he was not supposed to do, and he did so not once but several times until he was bleeding. Mr. Coleman denied this, but his testimony is clearly self-serving and not supported by the other evidence. The problem with his catheter on August 31st necessitated Mr. Coleman's visit to the hospital on September 1st, where he was re-catheterized and treated with antibiotics for an infection. This incident is clearly relevant because some of the medical testimony indicated, and the jury could have reasonably believed, that Mr. Coleman's eventual necrosis was a further complication of the initial improper catheterization, for which he himself was responsible.
Moreover, although Mr. Coleman is disabled, he is able to understand his nurse's instructions and is not completely unable to help himself. The testimony indicated that Mr. Coleman had a telephone next to his bed that he could use to call his relatives for assistance. He himself realized the deteriorating condition of his penis and was told several times that he needed to get to the hospital. Yet, not only did Mr. Coleman fail to secure any assistance for himself, he refused the repeated offers of assistance by Mr. Hills on September 6th.
PLOTKIN, J., Dissenting with Reasons.
A jury absolved Christian Home Health care of any fault in this factually intensive dispute. The testimony is in conflict and thus vast factual deference is given to the jury's verdict. See Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70; Guillory v. Insurance Co. of North America, 96-1084, (La.4/8/97), 692 So.2d 1029.
The majority attempts to circumvent this fundamental precept by selecting and relying on the expert testimony of Nurse Maria Trattler. The majority bases the defendant's liability solely on the testimony of Nurse Trattler. Unfortunately, the jury rejected her opinion and found for the defendant. The testimony of Christian Home Health Care (CHHC) care providers and other evidence presented to the jury supports the finding that CHHC used reasonable care in rendering home health care to Mr. Coleman.
CHHC employee Joseph Perkins testified that he observed Mr. Coleman catheterize himself until he began to bleed. A CHHC supervisor telephoned Mr. Coleman's sister to have her take him to the hospital. While waiting for the sister, Mr. Coleman insisted that Mr. Perkins leave his house. CHHC employee Larry Hills testified that he repeatedly told Mr. Coleman to seek medical attention for his swollen penis. Mr. Coleman stated that he would make the arrangements himself.
*826 "A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.'" Stobart v. State through Dept., of Transp., and Development, 617 So.2d 880, 882 (La.1993). As in the instant case, where more than one competing view is permissible, the final decision of the jury cannot be manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840 (La.1989), writ denied, 561 So.2d 105 (La.1990).
Further, the majority bases its reversal by creating a novel and original duty, unsupported by any authority, that "a nurse has a duty to act as an `advocate' for the patient" and that "Mr. Hills [CHHC's employee] had a duty...to get Mr. Coleman to the hospital."
Generally, a person owes a duty to exercise reasonable care to protect others against the foreseeable risks of his misconduct. Specifically, the issue in a particular case is whether that general duty extends to protect the plaintiff against the particular risk that occurred, in the particular manner in which it occurred.
Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law, § 5-1 (1996).
The record before this Court does not support the duty that the majority creates. Appellant has not proven that CHHC owed him a duty in this particular circumstance. Additionally, appellant did not assign or brief the issue that the standard of care for nursing was breached by CHHC by failing to arrange and transfer the plaintiff to the hospital in a timely manner. Obviously, the appellee does not comment on this issue. Thus, the legal predicate for the majority's reversal is not properly raised in this Court.
There is no discussion of how the majority determined the cause of the injuries and the damage award of $250,000. Without more, I cannot consider the amount of quantum granted in this case.
Accordingly, I respectfully dissent.
BAGNERIS, J., Dissenting with Reasons and Concurring with J. PLOTKIN'S Dissent.
I respectfully dissent from the majority opinion, and I concur with and adopt J. Plotkin's Dissent and reasoning.
In Migues v. Sagrera, 620 So.2d 463, 465 (La.App. 3 Cir.1993), our brethren in the Third Circuit stated that a nurse may be negligent, under the provisions of La. R.S. 40:1299.41(A) of the Louisiana Medical Malpractice Act, in the following circumstances:
Nurses and other health care providers are subject to the same standard as physicians. It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case.
After careful review of the record in this case, I find that Mr. Hills' actions did not breach this duty. Mr. Hills repeatedly advised Mr. Coleman that he needed to go to the hospital. However, Mr. Coleman repeatedly ignored Mr. Hills' advice. Additionally, Mr. Hills offered to call an ambulance for Mr. Coleman. Mr. Coleman refused this offer. The majority opinion implies that Mr. Hills and CHHC had a duty to force Mr. Coleman to go to a hospital. Our review of the jurisprudence and applicable law reveals no such duty. Further, a patient has a right to refuse medical treatment, which appears to be what Mr. Coleman did in this case.
*827 Mr. Coleman, despite being a paraplegic, was of sound mind. He had the ability to either take Mr. Hills' advice and accept Mr. Hills' offer to call an ambulance to transport him to the hospital, or he could have used the telephone himself to make his own arrangements to get to the hospital. Mr. Hills and CHC should not be taxed with a non-existent duty and a breach of that non-existent duty because of Mr. Coleman's actions, or lack thereof, in this matter.
NOTES
[1] We do not create any new duty. Rather, we have examined the trial court record with respect to the factual issue of the standard of care for nursing as established by members of the nursing profession. Of course, as the standard of care of a learned profession is a matter of specialized knowledge, outside of the common experience of laypersons, that standard must be evidenced by expert testimony. In the present case, the only such expert testimony is that of Nurse Trattler. In the absence of any contrary expert testimony, there is no basis for rejecting Nurse Trattler's expert testimony as to the standard of care in the nursing profession. Her testimony showed that, as part of the standard of care, a nurse has a duty to get a patient with Mr. Coleman's symptoms to the hospitaleven if the patient does not respond to the nurse's advice to go to the hospital. In other words, the uncontradicted expert testimony shows that noncompliant patients are part of the nurse's job, and that the nurse's duty is to see that such noncompliant patients receive vitally-needed medical care. CHHC's breach of its duty to get Mr. Coleman to the hospital in a timely manner was fully briefed in Mr. Coleman's Supplemental Brief on appeal. The causation on the injury is discussed above where we note the unctradicted medical testimony that necrosis takes 5 or 6 days to develop and that, if Mr. Coleman had gotten to the hospital at on earlier date, then he would not have suffered the injury of a necrotic penis. The basis of the general damages award, i.e., the injuries suffered by Mr. Coleman, is discussed above (surgical removal of dead penile tissue, the possibility of amputation of the penis, the belief for some time that the penis had been amputated, the permanent placement of a catheter through the abdomen into the bladder, a skin graft to the penis, loss of sexual function, and hospitalization for more than two months).